# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

FEC HOLDINGS, LP, a Texas limited
partnership; FEC MESQUITE, LP; a
Texas limited partnership; FEC
CHAMPIONS, LP, a Texas limited
partnership; FEC OKC
MACARTHUR, LLC, an Oklahoma
limited liability company; FEC
SUGARLAND, LP, a Texas limited
partnership; FEC EULESS, LP, a
Texas limited partnership; FEC
PASADENA, LP, a Texas limited
partnership; FEC LAFAYETTE, LLC,
a Louisiana limited liability company;
FEC EL PASO, LP, a Texas limited
partnership; and LLOYD ROBERT
FRENCH, III, an individual,

                Plaintiffs,

v.

INCREDIBLE PIZZA FRANCHISE
GROUP, LLC, a Missouri limited
liability company, RICHARD
BARSNESS, an individual, and
CHERYL BARSNESS, an individual,

                Defendants.

Court File No. 4:09-cv-03289

**FIRST AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiffs FEC Holdings, LP, Lloyd Robert French, III, FEC Mesquite, LP, FEC

Champions, LP, FEC OKC MacArthur, LLC, FEC Sugarland, LP, FEC Euless, LP, FEC

Pasadena, LP, FEC Lafayette, LLC, and FEC El Paso, LP (hereinafter collectively "FEC" or

"Plaintiffs"), by their attorneys Dady & Garner, P.A., and The Cunningham Law Group for their

Complaint against Defendants Incredible Pizza Franchise Group, LLC ("IPC" or "Defendant"), Richard Barsness, and Cheryl Barsness, state and allege as follows:

## INTRODUCTION

1.    At all times material hereto, Defendant IPC has franchised the "Incredible Pizza Company" concept, and Plaintiffs have owned and operated seven Incredible Pizza Company franchised locations pursuant to seven separate Franchise Agreements.

2.    Defendant Richard Barsness is and has been, at all times material hereto, the President and CEO of IPC.

3.    Defendant Cheryl Barsness is and has been, at all times material hereto, the Vice President, Secretary and Treasurer of IPC.

4.    Incredible Pizza Company locations are "family entertainment centers," offering pizza buffets and related food items, ticketed redemption and video games, go-carts and bumper cars, bowling, and a number of other entertainment options.

5.    Incredible Pizza Company locations, including the locations owned by Plaintiffs, are vast facilities, generally spanning more than 55,000 square feet with a cost of approximately $6 million a piece to build and furnish.  Each franchised location also has substantial ongoing operating expenses.

6.    As part of their obligations as sellers of a franchise, Defendants, in connection with and under each one of the seven currently in effect Franchise Agreements, were obligated to make written, prospectus-like, pre-sale disclosures about the franchise opportunities pursuant to the Uniform Franchise Offering Circular ("UFOC") Guidelines.

7.    As more fully detailed herein, Defendants violated their affirmative legal obligations in that regard.

2

8.     Plaintiffs, however, were unaware that Defendants had violated their franchise disclosure obligations, and, reasonably relying upon Defendants' pre-sale disclosures, elected to move forward with franchise development.

9.     In November 2003, continuing to reasonably rely upon IPC's and Richard and Cheryl Barsness's favorable (but ultimately misleading) representations regarding these franchise opportunities, the Parties executed an Area Development Agreement, which contemplated that FEC Holdings would develop 36 Incredible Pizza Company locations throughout 18 markets in the Midwest, South and Southwest United States.

10.     FEC Holdings executed the Area Development Agreement in reliance upon misleading "earnings claims" and other misleading statements by Defendants as to the scope of the vendor rebates that IPC would receive (*i.e.*, as a result of franchisee purchases from suppliers from which Plaintiffs were required to purchase certain items necessary to operate their franchises)—both topics that IPC and Richard and Cheryl Barsness were obligated to accurately disclose per UFOC Guidelines.

11.     From April 2004 though December 2007, reasonably relying upon representations that IPC and Richard and Cheryl Barsness continued to make (including, specifically, representations regarding the earnings potential of Incredible Pizza Company family entertainment centers), the FEC entities executed a number of Franchise Agreements with IPC for the operation of Incredible Pizza Company franchises.

12.     After executing the Franchise Agreements, building out their franchises, and only later taking over day-to-day management of their franchises, Plaintiffs began to realize that IPC, during the course of selling the Incredible Pizza Company franchise opportunity, had made

numerous misrepresentations and material omissions about the earnings potential of Incredible Pizza Company family entertainment centers.

13. Five of Plaintiffs' seven stores have suffered a cumulative loss in 2009.

14. Further, IPC has failed to perform its contract-in-fact and contract-in-law obligations under each of the Franchise Agreements to provide guidance and assistance to Plaintiffs in their operation of the franchises, including, but not limited to, the obligation to provide sufficient training and a marketing program.

15. IPC also violated its legal duty not to accept vendor rebates, commissions, or kickbacks as a result of Plaintiffs' purchases of goods and services from required suppliers in connection with the construction, build-out and operation of its IPC franchises (other than the 10% markup on proprietary items and the marketing rebates from Coca-Cola Company).

16. Plaintiffs also have discovered that IPC made a number of misleading disclosures and material omissions in the disclosure documents provided to Plaintiffs over the course of the parties' relationship (*e.g.*, regarding IPC's trademarks, mandatory fees, vendor rebates and earnings claims).

17. As a result of Defendants' breaches of their affirmative legal duties to Plaintiffs, Plaintiffs have invested over $46 million in family entertainment centers that operate at a substantial loss.

18. Therefore, Plaintiffs seek rescission of the Area Development Agreement and all Franchise Agreements between the parties, along with an award of damages sufficient to put Plaintiffs in the position they would have occupied had they not entered into the Area Development Agreement and Franchise Agreements (*i.e.*, damages in the amount that Plaintiffs

have invested in the Incredible Pizza Company franchise opportunities in reliance upon Defendants' misleading representations and material omissions).

## PARTIES

19.     Plaintiff FEC Holdings, LP is a Texas limited partnership with its principal place of business at 1811 Bering Drive, Suite 400, Houston, Texas.

20.     Plaintiff Lloyd Robert French, III ("Robin French") is a citizen of Texas, residing at 5139 Tangle Lane, Houston, Texas.

21.     Plaintiff FEC Champions, LP is a Texas limited partnership with its principal place of business at 1811 Bering Drive, Suite 400, Houston, Texas.

22.     Plaintiff FEC Mesquite, LP is a Texas limited partnership with its principal place of business at 1811 Bering Drive, Suite 400, Houston, Texas.

23.     Plaintiff FEC OKC MacArthur, LLC is an Oklahoma limited liability corporation with its principal place of business at 1811 Bering Drive, Suite 400, Houston, Texas.

24.     Plaintiff FEC Sugarland, LP is a Texas limited partnership with its principal place of business at 1811 Bering Drive, Suite 400, Houston, Texas.

25.     Plaintiff FEC Euless, LP is a Texas limited partnership with its principal place of business at 1811 Bering Drive, Suite 400, Houston, Texas.

26.     Plaintiff FEC Pasadena, LP is a Texas limited partnership with its principal place of business at 1811 Bering Drive, Suite 400, Houston, Texas.

27.     Plaintiff FEC Lafayette, LLC is a Louisiana limited liability company with its principal place of business at 1811 Bering Drive, Suite 400, Houston, Texas.

28.     Plaintiff FEC El Paso, LP is a Texas limited partnership with its principal place of business at 1811 Bering Drive, Suite 400, Houston, Texas.

5

29.     Defendant IPC is a Missouri limited liability corporation with its principal place of business at 2552 South Campbell, Springfield, Missouri.  IPC is the franchisor of Incredible Pizza-branded "family entertainment centers."

30.     Defendant Richard Barsness is, upon information and belief, a resident of Missouri, residing at 9894 East FM 156, Rogersville, Missouri.  Defendant Richard Barsness has been, at all times material to this action, the President and Chief Executive Officer of Incredible Pizza Company Franchise Group.

31.     Defendant Cheryl Barsness is, upon information and belief, a resident of Missouri, residing at 9894 East FM 156, Rogersville, Missouri.  Defendant Cheryl Barsness has been, at all times material to this action, the Vice President, Treasurer and Secretary of Incredible Pizza Company Franchise Group.

## JURISDICTION AND VENUE

32.     Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties and because Defendants' acceptance of vendor rebates presents a federal question under the Robinson-Patman Act.

33.     The amount in controversy is reasonably believed to be substantially in excess of $75,000.

34.     Venue is proper in this district, pursuant to 28 U.S.C. 1391(a)(2), because a substantial part of the events and omissions arising out of this cause of action occurred in this district.

## FACTS

35.     Robin French and his business associate, Danny Mullen, first became interested in exploring the IPC concept in 2002, when they began discussing business opportunities, and,

6

particularly, the prospect of opening a restaurant concept that also provided family entertainment.

36.     Mr. Mullen knew Richard and Cheryl Barsness because, in 1998, Mr. Mullen had purchased two Mr. Gatti's franchises from an investment group that had a purchase and sale agreement with Richard Barsness.

37.     Mr. Mullen eventually became the president of Mr. Gatti's (a company that offered franchises for all-you-can-eat pizza restaurants), a position he left in 1999.

38.     In 2002, Mr. Mullen and Mr. French were considering various business opportunities and decided to approach Mr. Gatti's to inquire about obtaining an Area Development Agreement to open "Gattiland" locations (a pizza and family entertainment center concept that was being developed by the Mr. Gatti's company).

39.     Not long after making this inquiry, Mr. Mullen was contacted by Richard and Cheryl Barsness and Larry Abbe (the former store manager of Mr. Mullen's Mr. Gatti's franchises, who, at times material hereto, acted as Richard and Cheryl Barsness's business partner).  Mr. Abbe and Richard and Cheryl Barsness invited Mr. Mullen to visit Springfield, Missouri, for a tour of their new family entertainment center concept, the Incredible Pizza Company, and to discuss this possible business opportunity.

40.     Less than a week later, in June 2002, Mr. Mullen drove to Springfield from Tulsa, Oklahoma, to see the Springfield Incredible Pizza Company family entertainment center, which was under construction and set to open in August 2002.  While in Springfield, Mr. Mullen met with Mr. Abbe and Richard and Cheryl Barsness and discussed the Incredible Pizza Company concept.

41.     During these meetings, Richard and Cheryl Barsness indicated that they were looking for a business partnership of some sort to help them get the concept off the ground, whether through a franchise relationship or otherwise.

42.     Richard and Cheryl Barsness also made a number of promises about the Incredible Pizza Company system, stating that the Incredible Pizza Company system would provide certain advantages that the Mr. Gatti's system (a system with which Mr. Mullen was quite familiar) did not.

**Richard and Cheryl Barsness and IPC Make Pre-Sale Representations Regarding the Incredible Pizza Franchise Opportunity.**

43.     After Mr. Mullen's visit to Springfield in June 2002, the Barsnesses continued to court Mr. French and Mr. Mullen in an attempt to secure some sort of business arrangement to get the Incredible Pizza Company concept off the ground.

44.     For example, Richard and/or Cheryl Barsness faxed Mr. Mullen and Mr. French a "Pro and Con" list, comparing the Mr. Gatti's concept with the Incredible Pizza Company concept.  (A true and correct copy of the "Pro and Con" list is attached hereto as **Exhibit A**.)

45.     This "Pro and Con" list gave a long list of "pros" regarding the Incredible Pizza Company concept, such as connections to favorable companies and pricing, and the combined nearly 50 years' experience of Richard Barsness and Larry Abbe.

46.     The "Pro and Con" list also focused on the negatives of the Mr. Gatti's system, including the fact that the Mr. Gatti's franchisor provided "absolutely no support" (implying that IPC would provide its franchisees with far superior support than that available from the Mr. Gatti's system).

8

47. Further, the "Pro and Con" list expressly stated that Incredible Pizza Company franchisees would benefit from constant support, great training and materials, comprehensive marketing plans, construction supervision, better food, lower costs, etc.

48. Over the following months, Mr. Mullen and Mr. French had numerous conversations and meetings with Richard and Cheryl Barsness regarding the Incredible Pizza Company franchise opportunity. During these conversations, Richard and Cheryl Barsness repeatedly made the following representations regarding the benefits of the Incredible Pizza Company system, including, in particular:

(a) IPC would not receive any commissions or rebates as a result of franchisees' purchases from required suppliers;

(b) IPC would provide substantial support to its franchisees; and

(c) IPC would dramatically expand the number of Incredible Pizza Company units nationwide so as to increase visibility and brand recognition.

49. In attempting to sell the Incredible Pizza Company concept to Mr. Mullen and Mr. French, Richard Barsness traveled to both Tulsa, Oklahoma and Houston, Texas to meet with Mr. Mullen and Mr. French. Mr. Barsness made many of the representations (and material omissions) in an attempt to sell the Incredible Pizza Company franchise opportunity during the course of his Texas visit.

50. During this same time period, IPC and Richard and Cheryl Barsness also engaged in an ongoing pattern of conduct in providing Plaintiffs with illegal "earnings claims" data, as described in detail below.

9

51.     Upon information and belief, it was Defendants' intent that Plaintiffs rely upon these representations and, in reliance upon these representations, Plaintiffs built out a host of Incredible Pizza Company franchised units.

52.     Furthermore, Defendants failed to affirmatively identify their subjective knowledge that a similar California-based family entertainment center chain had been operating under a strikingly similar name.

53.     Upon information and belief, at the time that Richard and Cheryl Barsness began attempting to sell the Incredible Pizza Company franchise concept to Mr. French and Mr. Mullen, Richard and Cheryl Barsness knew that a similar concept operating under the name "John's Incredible Pizza Company" had been developed in the State of California.

54.     Also upon information and belief, Richard and Cheryl Barsness had, at one time, attempted to do business with John Parlet, the founder of John's Incredible Pizza system, and, when that business relationship fell apart, the Barsnesses attempted to develop their own "Incredible Pizza Company" system (following Mr. Parlet's development of the John's Incredible Pizza Company system).

55.     Richard and Cheryl Barsness told Mr. Mullen and Mr. French that John's Incredible Pizza Company system had actually taken its concept, trademarks, etc. from Incredible Pizza Company.

56.     Defendants made no suggestion to Mr. Mullen or Mr. French that John's Incredible Pizza Company used the Incredible Pizza Company marks prior to IPC's use of the marks (even though they were under an affirmative obligation to make such disclosure).

### IPC Makes Earnings Claims Based On Its Company Store's Financials

57.     On August 20, 2002, IPC opened its company store (and the first Incredible Pizza Company location) in Springfield, Missouri.

58.     In March of 2003, IPC representatives began making a number of representations to Mr. Mullen, Mr. French and other FEC representatives regarding the earnings capabilities of the Springfield store.

59.     In fact, IPC provided FEC representatives with financial statements from the Springfield store representing that the Incredible Pizza Company family entertainment center had generated weekly sales of at least $150,000.

60.     As described in detail *infra*, Defendants' "earnings claims" in this regard were not properly disclosed—or disclosed at all—in Item 19 of the three UFOCs that IPC provided to FEC.

61.     On March 14, 2003, Richard and Cheryl Barsness provided Mr. French and Mr. Mullen with a document entitled "Springfield's Incredible Pizza Company Budgeted Period 2 February 2003 Statement of Earning[s]."  (A true and correct copy of this document is attached hereto as **Exhibit B**.)

62.     This document indicated that the Springfield store achieved a gross profit of $510,368.22 in the first two months, with revenues of $896,487.96 and operating costs of 56.93% of revenue.

63.     Over the following months (and prior to the execution of the Area Development Agreement or any Franchise Agreements), IPC representatives continued to provide FEC with numerous financial statements and projections, all reflecting substantial (and increasing) profits for the corporate-owned Springfield Incredible Pizza Company family entertainment center and

11

predictions of substantial profits for Incredible Pizza Company family entertainment centers located in the cities where FEC was considering opening franchises.

64.     Mr. French and Mr. Mullen reasonably relied upon these financial statements and projections that IPC representatives provided to them as they and their investor partners made the decision to execute the Area Development Agreement and subsequent Franchise Agreements (and, likewise, to invest millions of dollar in the Incredible Pizza Company concept in order to perform their obligations under the Franchise Agreements).

65.     In fact, Plaintiffs used the Springfield numbers in order to develop its business plan and raise revenue for the concept from investors.  (An example of the projections that Plaintiffs developed in reliance upon the Springfield number is attached hereto as **Exhibit C**.)

66.     On September 10, 2003, Richard Barsness sent Mr. Mullen an email with the "Incredible Pizza Company Business Plan Outline."  (A true and correct copy of this email is attached hereto as **Exhibit D**.)

67.     In this email, Richard Barsness indicated that Incredible Pizza Company locations experience 15,000+ customers per week at an average sale of $10-$12 (which constitutes a representation of weekly sales of at least $150,000 and annual sales of at least $7,800,000).

68.     Again, Mr. Mullen and Mr. French reasonably relied upon the information Richard Barsness provided to them regarding the earnings potential of Incredible Pizza Company family entertainment centers in making the decision to execute the Area Development Agreement and the seven Franchise Agreements.

## The 2003 UFOC

69.     On or about September 17, 2003, IPC provided Mr. Mullen and Mr. French with a copy of the IPC Uniform Franchise Offering Circular (the "2003 UFOC"). (A true and correct copy of the 2003 UFOC is attached hereto as **Exhibit E**.)

70.     The UFOC is a prospectus-like document designed to allow a prospective franchisee to engage in due diligence regarding the substantial investment required to establish a franchise (*i.e.*, because a prospective franchisee would not ordinarily have ready access to system data in the absence of an affirmative disclosure duty on the party of the franchisor).

71.     The sale of a franchise opportunity, including IPC's sale of the Incredible Pizza Company franchise opportunity to Plaintiffs, is not an arms-length transaction.

72.     The FTC Franchise Rule, 16 C.F.R. § 436 *et seq*., accordingly requires that franchisors comply with certain disclosure requirements regarding the franchise opportunity (*e.g.*, the "UFOC Guidelines").

73.     Because IPC utilizes the UFOC format in order to comply with its disclosure requirements, IPC is required to follow the UFOC Guidelines with respect to the content and formatting of a host of disclosures (deemed important in assisting the prospective franchisee with his/her investment decision).

74.     Plaintiffs did not have access to the information regarding the franchise opportunity contained in the UFOC outside of that disclosure document. It is for that reason that state and federal government authorities have mandated that certain disclosure be made to prospective franchisees.

75.     Defendants, however, did not comply with their affirmative disclosure obligations under the UFOC Guidelines.

76.     As more full detailed below, Defendants violated their disclosure obligations with respect to Items 6, 8, 13, and 19 of the UFOC Guidelines.

### *Fee Obligation Disclosure Under Item 6*

77.     For example, the UFOC Guidelines require a franchisor to disclose, under Item 6 of the UFOC, all fees (other than the initial franchise fee) that a franchisee may be required to pay over the course of the parties' relationship.

78.     Item 6 of IPC's 2003 UFOC outlines the fees that an Incredible Pizza Company franchisee would incur, including a management fee of two to ten percent (2 to 10%) of gross sales payable to Incredible Pizza Management Company.  (Exh. E at p. 5.)

79.     However, IPC did <u>not</u> disclose in Item 6 that this management fee is mandatory, not optional, for <u>all</u> Incredible Pizza Company franchisees (but not for corporate-owned stores)—a material fact that FEC did not discover until after executing the ADA and some Franchise Agreements.  (*See* Exh. E at p. 5.)

80.     IPC's failure to disclose the fact that the management fee is a mandatory fee constitutes a material misrepresentation (and material omission) in regard to the costs associated with the Incredible Pizza Company franchise opportunity (*i.e.*, the mandatory management fee drove up the cost of operating an Incredible Pizza Company family entertainment center so as to make the business uneconomical for franchised units).

81.     Specifically, the existence of the mandatory management fee has driven away numerous potential franchisees, and, overall, limited the development of the Incredible Pizza Company concept.

## *Purchase Obligations and Vendor Rebate Disclosures Under Item 8*

82.     Item 8 of the UFOC Guidelines requires a franchisor to disclose any rebates, commissions, kickbacks, or other benefits that the franchisor may receive as a result of franchisee purchases from suppliers or vendors from which the franchisor requires franchisees to make certain purchases.

83.     Specifically, Item 8 requires that the franchisor disclose "whether, and if so, the precise basis by which the franchisor or its affiliates will or may derive revenue or other material consideration as a result of required purchases and leases."  *See* UFOC Guidelines, Bus. Franchise Guide (CCH) ¶ 5760.

84.     In Item 8 of the 2003 UFOC, IPC states that it "will receive a commission of 10% on sales by our approved suppliers to franchisees of *proprietary* meats, cheeses, flours, sauces, dressings and napkins."  (Exh. E at p. 10 (emphasis added).)

85.     IPC also states in Item 8 that it will receive a "marketing rebate from Coca-Cola based on product usage and equipment rental."  (Exh. E at p. 10.)

86.     Finally, IPC states, in Item 8 of the 2003 UFOC, that "[e]xcept for these, we do not receive any royalties, commissions or rebates from vendors which supply franchised FECs . . . ."  (Exh. E at p. 10.)

87.     In short, IPC promised to FEC that it would not accept any vendor rebates, commissions, and kickbacks as a result of franchisee purchases from required suppliers, other than a 10% markup on proprietary items and the Coca-Cola rebate.

88.     As discussed in detail *infra*, IPC has, upon information and belief, received vendor rebates in addition to the 10% markup on proprietary items and the Coca-Cola marketing rebate, as discussed *infra*.

89.     Further, IPC's receipt of vendor rebates, commissions and kickbacks, other than the 10% mark-up on proprietary items and the Coca-Cola marketing rebate, renders the disclosures made by IPC in Item 8 of the 2003 UFOC false.

### *Trademark Disclosures Under Item 13*

90.     Pursuant to the UFOC Guidelines regarding Item 13, a franchisor must disclose information regarding the franchisor's trademarks, including "whether the franchisor knows of either superior rights or infringing uses that could materially affect the franchisee's use of the principal trademarks…." 16 C.F.R. § 436.5.

91.     In the 2003 UFOC, IPC only states that it is aware of John's Incredible Pizza Company, "which claims to have operated under the name 'John's Incredible Pizza' prior to [IPC's] use of [its] Mark and this company claims to be able to prevent [IPC] from operating or franchising FECs in certain areas in which this company is operating . . . ." (Exh. E at p. 17.)

92.     IPC does not state in Item 13 of the 2003 UFOC that IPC actually – *i.e.*, subjectively – knew that John's Incredible Pizza Company had already operated using the Incredible Pizza Company marks prior to IPC's use of the marks (which information, upon information and belief, IPC and Richard and Cheryl Barsness did actually know). (*See* Exh. E at pp. 17-18.)

93.     IPC also does not disclose in Item 13 that IPC subjectively knew that John's Incredible Pizza Company had a "superior prior right" or "infringing use" in regard to the Incredible Pizza Company Marks (which information, upon information and belief, IPC and Richard and Cheryl Barsness did actually know). (*See* Exh. E at pp. 17-18.)

16

94.     In short, IPC failed to comply with its disclosure obligations under Item 13 of the UFOC Guidelines, and falsely represented to FEC that it did not actually know that John's Incredible Pizza Company had a superior prior right to the Incredible Pizza Company Marks.

### *Earnings Claims Disclosures Under Item 19*

95.     As part of its disclosures under Item 19 of the UFOC, a franchisor must disclose all earnings claims that it makes to prospective franchisees, including the complete factual bases therefore.

96.     The Item 19 UFOC Guidelines define "earnings claim" to mean "information given to a prospective franchisee by, on behalf of or at the direction of the franchisor or its agent, from which a specific level or range of actual or potential sales, costs, income or profit from franchised or non-franchised units may be easily ascertained."

97.     Additionally, the UFOC Guidelines contain detailed instructions regarding what information a franchisor must disclose in Item 19 in the event it makes an earnings claim.

98.     Specifically, Item 19 requires that a franchisor that makes earnings claims include a description of the factual bases and all material assumptions underlying the preparation and presentation of these earnings claims.

99.     In other words, the Item 19 disclosures must include "material assumptions, other than matters of common knowledge, underlying the [earnings] claim." 16 C.F.R. § 436.5.

100.    The "Item 19 Instructions" specify that the "factual basis" for the earnings claims includes "economic or market conditions which are basic to a franchisee's operation and encompass matters affecting, among other things, franchisee's sales, the cost of goods or services sold and operating expenses." (UFOC Guidelines, Item 19 Instructions, Bus. Franchise Guide (CCH) ¶ 5771.)

101.    Further, when a franchisor makes an affirmative earning claims under Item 19 (as IPC does), the franchisor must include "a statement of whether the claim is based upon actual experience of franchised units and, if so, the percentage of franchised outlets in operation for the period covered by the earnings claim that have actually attained or surpassed the stated results." (*Id.*)

102.    In Item 19 of the 2003 UFOC, IPC attaches the August 2002 to July 2003 Profit and Loss Statement from the corporate-owned Incredible Pizza Company family entertainment center in Springfield, Missouri, and states that this location "offers substantially the same products and services that [franchised locations] will be offering." (Exh. E at p. 25.)

103.    Exhibit G to the UFOC, the Springfield profit and loss statement, indicates that Incredible Pizza Company locations could expect annual earnings from operations of over $1.3 million.

104.    The earnings claims implied that the performance of franchised units would be similar to that of corporate-owned units, which is not the case.

105.    Rather, the performance of corporate-owned units varies dramatically from that of franchised units.

106.    Further, geographic differences between the corporate location and the franchised location may affect the franchisee's ability to replicate corporate-owned store performance metrics—something IPC did not disclose.

107.    IPC does not disclose any other earnings claims in Item 19 of the 2003 UFOC (*i.e.*, IPC does not disclose, either generally or with the requisite specifics, Richard and Cheryl Barsness's representations to the effect that Incredible Pizza Company locations experience

15,000-plus customers a week, with sales of $10 to $12 per customer, for annual sales of at least $7.8 million).  (*See* Exh. E at pp. 25-26.)

108.    Further, IPC does not provide information on the material assumptions underlying the earnings claims disclosures set forth in Item 19 of the 2003 UFOC.  (*See* Exh. E at pp. 25-26.)

109.    Finally, the earnings claims that IPC provides in the 2003 UFOC do not account for the fact that corporate-owned stores (including the Springfield, Missouri store) do not pay the 5% franchise fee or any mandatory management fee.  IPC does not disclose these or any of the many other material facts that indicate that a franchised unit's performance would likely differ significantly, and adversely, from the performance of a corporate unit.

### The Area Development Agreement

110.    On November 25, 2003, reasonably relying upon the above-described representations and material omissions by Richard and Cheryl Barsness and other IPC representatives, including the representations made in the 2003 UFOC, Whole Family Entertainment, LLP ("Whole Family")[1] executed an Area Development Agreement (the "ADA") with IPC for the development of Incredible Pizza Company franchises in a number of states.  (A true and correct copy of the ADA, along with its subsequent amendments, is attached hereto as **Exhibit F**.)[2]

111.    In connection with the execution of the ADA, FEC paid a total of $180,000 (In two installments).  This payment purchased the right to develop a total of 36 Incredible Pizza

---

[1] Whole Family, another entity owned by Robin French, assigned its rights under the ADA to FEC Holdings, LP in July 2004.

[2] The ADA was supplemented a number of times during the course of the Parties' relationship in order to alter the list of geographic territories covered by the ADA, but IPC's commitments regarding vendor rebates, commissions and kickbacks did not change.

Company franchised locations in 18 markets and served as a $10,000 down payment on the franchise fee for the first store opened in each market.

112.    In the ADA, IPC promises:

> Except for Coca-Cola Company rebates and the 10% mark up of our proprietary products, we shall not accept any Commissions from any distributors, vendors or similar suppliers that are related to the business contemplated by this Agreement.

(Exh. F at § 9(n).)

113.    In other words, through the ADA, IPC contractually obligated itself not to accept vendor rebates, commissions or kickbacks other than a 10% mark up on *proprietary* items and the Coca-Cola marketing rebate.

114.    IPC also promises as part of the ADA that:

> We also acknowledge that we will receive nothing of monetary value, including, but not limited to rebates, refunds, credits, incentives, gifts and/or kickbacks ("commissions") of any kind from any contractors and/or merchants relating to the construction of the [Incredible Pizza Company franchised locations].

(Exh. F at § 6(c).)

115.    In short, despite any suggestion to the contrary in the UFOCs initially circulated by IPC, IPC promised, by executing the ADA, that: (1) it would not receive any commissions from any vendors or similar suppliers as a result of franchisee purchases, except for the Coca-Cola Company rebates and a 10% markup on Incredible Pizza Company *proprietary* products; and (2) it would not receive any "commissions" from any contractors or merchants relating to the construction of the FEC Incredible Pizza Company franchised units.

116.    IPC does not, for example, reserve the right to receive a 3% rebate on dishwashing supplies, chemicals, etc. (*Id.*)

117.    Further, IPC does not reserve any right to receive rebates, commissions or kickbacks on private label (*i.e.,* non-proprietary) items and, in fact, promises not to receive these rebates.  (*Id.*)

118.    Finally, IPC does not reserve the right to receive any rebates, commissions, or other benefits as a result of Incredible Pizza franchisees' use of Dr. Pepper products and equipment, and, in fact, promises to only receive the marketing rebate from Coca-Cola that is specified in the ADA.  (*Id.*)

119.    In sum, IPC specifically promised that IPC would not receive kickbacks, vendor rebates, commissions or other benefits as a result of FEC's purchases, other than the Coca-Cola marketing rebate and the 10% mark-up on proprietary products.  (*Id.*)

120.    Further, IPC knew, at the time that it made these promises in the ADA, that it did, in fact, intend to receive rebates, commissions and kickbacks, other than the Coca-Cola marketing rebate and the 10% mark-up on its proprietary items, as a result of franchisee purchases.  IPC also knew that it would be receiving things of monetary value as a result of the construction of FEC's Incredible Pizza Company franchises.

121.    FEC reasonably relied upon IPC's promises in regard to the vendor rebates that it would be receiving and not receiving in making the decision to execute both the Area Development Agreement and the seven Franchise Agreements that FEC subsequently executed with IPC.

122.    Only after cancellation of the Management Agreements and assumption of management of the day-to-day operations of their franchises did Plaintiffs discover Defendants' breaches of these commitments in regard to vendor rebates, commissions, and kickbacks by, upon information and belief, receiving said rebates, commissions, and kickbacks from vendors

from which Plaintiffs were required to make purchases in connection with the construction, build-out, and operation of all of Plaintiffs' Incredible Pizza Company franchised units.

123. In other words, Plaintiffs did not discover that Defendants' statements in regard to vendor rebates were false until after Plaintiffs managed their own stores for some time.

## The Letter Agreement

124. Contemporaneously with the execution of the ADA, Whole Family[3] and IPC executed a "Letter Agreement," which served to clarify the Parties' intentions under the terms of the ADA and any subsequent Franchise Agreements that would be executed pursuant to the ADA. (A true and correct copy of the Letter Agreement is attached hereto as **Exhibit G**.)

125. The Letter Agreement, by its express terms, operates to clarify the Parties' intentions in regard to the ADA by allowing Mr. French to terminate the ADA at will, with no contingent liabilities. (Exh. F at § 3(b))[4].

126. Section 5 of the Letter Agreement states that, in the event there is a conflict between the Letter Agreement and any other Agreement between the Parties, including the ADA and the Franchise Agreements, the Letter Agreement controls. (Exh. G at § 5.)

## The Houston Franchise Agreement

127. On April 16, 2004, reasonably relying upon the representations in the ADA, Letter Agreement, 2003 UFOC, the earnings claims made outside of the UFOC, and those representations made by Richard Barsness regarding the Incredible Pizza Company system, FEC

---

[3] Whole Family's rights under the Letter Agreement were also subsequently assigned to FEC Holdings.

[4] The ADA itself only gives IPC the right to terminate the ADA if FEC were to commit one of seven wrongs outlined as grounds for termination, and does not give FEC any right to terminate the ADA. (Ex. E. at § 8.)

Houston 1960, LP[5] and IPC executed a Franchise Agreement for operation of an Incredible Pizza Company franchise to be located at 310 FM 1960, Houston, Texas.[6] (A true and correct copy of the Houston Franchise Agreement is attached hereto as **Exhibit H**.)

128. FEC Holdings paid an initial franchise fee of $50,000 to acquire the right to open an Incredible Pizza Company franchise in Houston.

129. In Section 5.1 of the Houston Franchise Agreement, IPC promises that, as franchisor, it will provide the franchisee with guidance and assistance in regard to:

    a. Food preparation, packaging, sale and delivery of the products authorized for sale by the franchise and specifications, standards, and operating procedures used by franchises;

    b. Purchasing approved equipment, video and redemption games, rides and attractions, furniture, furnishings, signs, food and beverage products, operating materials and supplies;

    c. Operating and maintaining all video and redemption games, rides and attractions and stocking and displaying redemption center merchandise and other merchandise;

    d. Development and implementation of local advertising and promotional programs;

---

[5] The corporate entity FEC Houston 1960, LP no longer exists. The Houston-area Incredible Pizza Company franchise is operated and funded by FEC Champions, LP, a party to this action. All of FEC Houston's interests in the Houston-area Incredible Pizza Company franchise were transferred to FEC Champions.

[6] Due to lease problems, Plaintiffs never opened a location at this address. The Houston-area Incredible Pizza Company franchise eventually opened at 3645 FM 1960 West, Suite B, Houston, Texas and was operated by FEC Champions.

e.      Administrative, bookkeeping, accounting, inventory control and general operating and management procedures;

f.      Establishing and conducting employee training programs at the franchise; and

g.      Changes in any of the above that occur from time to time.

(Exh. H at § 5.1.)

## The 2004 UFOC

130.    On or about June 10, 2004, IPC provided FEC with an updated copy of the IPC UFOC (the "2004 UFOC"). (A true and correct copy of the 2004 UFOC is attached hereto as **Exhibit I**.)

### *Fee Obligation Disclosure Under Item 6*

131.    In Item 6 of the 2004 UFOC, IPC outlines the fees an IPC franchisee would incur, including a management fee of 5% of gross sales payable to Incredible Pizza Management Co. (Exh. I at p. 6.)

132.    However, IPC again did not disclose that these management services (and the associated fees) are mandatory, not optional, for all Incredible Pizza Company franchisees (but not for corporate-owned stores)—a fact that FEC did not discover until after executing the ADA. (*See* Exh. I at p. 5.)

133.    IPC's failure to disclose the fact that the management fee is a mandatory fee constitutes a material misrepresentation in regard to the costs associated with the Incredible Pizza Company franchise opportunity (*i.e.*, the mandatory management fee drove up the cost of operating an Incredible Pizza Company family entertainment center so as to make the business uneconomical for franchised units).

24

### *Purchase Obligations and Vendor Rebate Disclosures Under Item 8*

134.    In Item 8 of the 2004 UFOC, IPC states that it "will receive a commission of 10% on sales by our approved suppliers to franchisees of proprietary meats, cheeses, flours, sauces, dressings, proprietary ice cream mixes and napkins."  (Exh. I at p. 11.)

135.    Further, IPC states that it will receive "a rebate of 3% on sales by one of our vendors to franchisees for dishwashing soap, chemicals, hand soaps, detergents and other related products." (Exh. I at p. 11.) [7]

136.    IPC also discloses in Item 8 that it will receive a "marketing rebate from Coca-Cola based on product usage and equipment rental."  (Exh. I at p. 11.)

137.    Finally, IPC states in Item 8 that "[e]xcept for these [disclosed rebates], we do not receive any royalties, commissions or rebates from vendors which supply franchised [Incredible Pizza Company locations] . . . ."  (Exh. I at p. 11.)

138.    When it received the 2004 UFOC containing these disclosures regarding additional rebates beyond the 10% markup on proprietary items and the marketing rebate from Coca-Cola, Plaintiffs were not alarmed because the ADA expressly limited IPC's ability to accept rebates, commissions, and kickbacks in regard to Plaintiffs' purchases from vendors.

### *Trademark Disclosures Under Item 13*

139.    In Item 13 of the 2004 UFOC, IPC discloses that it is aware of John's Incredible Pizza Company, "which claims to have operated under the name 'John's Incredible Pizza' prior to [IPC's] use of [its] Mark and this company claims to be able to prevent [IPC] from operating or franchising [Incredible Pizza Company locations] in certain areas in which this company is operating . . . ."  (Exh. I at p. 18.)

---

[7] This provision was not included in the 2003 UFOC, and the ADA prohibits these rebates in connection with Plaintiffs' purchase of these products.

140.    IPC goes on to state in Item 13:

> [John's Incredible Pizza Company] claims that its use of its marks prior to
> the date of our first use constitutes sufficient grounds to prevent our
> registration [of the Incredible Pizza Marks], and further alleges that we
> obtained our trademark registration fraudulently because we knew about
> JIPC's use of its marks before we filed our statement of use for the
> trademark application.

(Exh. I at p. 18.)

141.    IPC does not disclose in Item 13 of the 2004 UFOC that it actually knew that
John's Incredible Pizza Company operated using the Incredible Pizza Company Marks before
IPC began using those Marks (which, upon information and belief, IPC's representatives, and
particularly Richard and Cheryl Barsness, did actually know).  (*See* Exh. I at pp. 17-19.)

142.    IPC also did not disclose in Item 13 that it actually knew that John's Incredible
Pizza Company claimed a "superior prior right" or "infringing use" in regard to the Incredible
Pizza Company Marks.  (*See* Exh. H at pp. 16-19.)

### *Earnings Claims Disclosure Under Item 19*

143.    In Item 19 of the 2004 UFOC, IPC attaches the January 2003 through December
2003 Profit and Loss Statement from the corporate-owned location in Springfield, Missouri, and
states that this location "offers substantially the same products and services that [franchised
locations] will be offering."  (Exh. I at p. 26.)

144.    The earnings claims implied that the performance of franchised units would be
similar to that of corporate-owned units, which is not the case.

145.    Rather, the performance of corporate-owned units varies dramatically from that of
franchised units.

146.    Further, geographic differences between the corporate location and the franchised
location may affect revenues and expenses—and IPC does not disclose this material fact.

147.   IPC also does not disclose any of the other earnings claims that it had made to Plaintiffs in Item 19.  (*See* Exh. I at p. 26.)

148.   Additionally, IPC does not provide information on the material assumptions underlying the earnings claims made in Item 19, or information on the percentage of franchised outlets in operation that actually obtained the reported results, as required by the UFOC Guidelines.  (*See* Exh. I at p. 26.)

149.   Further, IPC does not, in its earnings claims, account for the fact that corporate-owned stores (including the Springfield, Missouri store) do not pay the 5% franchise fee or the mandatory management fee—*i.e.,* IPC does not disclose these material facts that suggest that a franchised unit's performance would likely differ from that of a corporate unit because of substantial additional expenses that a franchised unit incurs.

## Whole Family Assigns the ADA to FEC

150.   On July 21, 2004, Whole Family assigned its rights under the ADA and the Letter Agreement to FEC Holdings, LP.

## The Oklahoma City Franchise Agreement

151.   On August 12, 2004, reasonably relying upon the representations in the ADA, Letter Agreement, UFOCs, and the additional earnings claims made outside of the UFOC, along with those representations made by Richard and Cheryl Barsness regarding the IPC system, FEC OKC MacArthur, LLC and IPC executed a Franchise Agreement for operation of an Incredible Pizza Company franchise to be located in Oklahoma City, Oklahoma.  (A true and correct copy of the Oklahoma City Franchise Agreement is attached hereto as **Exhibit J**.)

152.     FEC Holdings paid an initial franchise fee of $50,000 to acquire the right to open an Incredible Pizza Company franchise in Oklahoma City ($10,000 of which had already been paid in connection with the ADA).

153.     Section 5.1 of the OKC Franchise Agreement obligated IPC to provide the same guidance and assistance as outlined in Section 5.1 of the Houston Franchise Agreement.  (Exh. J at § 5.1.)

## IPC Makes More Earnings Claims

154.     On October 21, 2004, IPC provided Plaintiffs with a Profit and Loss Statement for August 2003 through July 2004 for the corporate-owned Incredible Pizza Company location in Springfield, Missouri.  (A true and correct copy of this financial information is attached hereto as **Exhibit K**.)

155.     The Profit and Loss Statement reflected that, during those 12 months, the corporate-owned Springfield location realized a gross profit of over $2.2 million and had a cost of sales of $858,515.06 (*i.e.*, 19.25% of the net sales of $4,459,703.88).  (*See* Exh. K.)

156.     On January 6, 2005, IPC representatives provided FEC representatives with Profit and Loss Statements for the Springfield, Missouri, location and for another corporate-owned Incredible Pizza Company location in Tulsa, Oklahoma.  (A true and correct copy of this financial information is attached hereto as **Exhibit L**.)

157.     These Profit and Loss Statements showed that the corporate-owned Tulsa location realized a gross profit of over $1.1 million during the four month period of August 2004 through November 2004, and, during the eleven month period ended in November 2004, the corporate-owned Springfield location realized a gross profit of over $1.9 million.  (*See* Exh. L.)

28

158.    IPC did not provide Plaintiffs with an updated UFOC disclosing these new and additional earnings claims in Item 19, and IPC did not otherwise disclose this information in the 2003 and 2004 UFOCs.

**The Sugarland Franchise Agreement**

159.    On April 1, 2005, reasonably relying upon the representations and promises in the ADA, the Letter Agreement, the UFOCs, and the additional earnings claims made outside of the UFOCs, along with those representations made by Richard and Cheryl Barsness regarding the IPC system, FEC Sugarland, LP executed a Franchise Agreement for operation of an Incredible Pizza Company franchise to be located at 3410 State Highway 6, Sugarland, Texas.  (A true and correct copy of the Sugarland Franchise Agreement is attached hereto as **Exhibit M**.)

160.    FEC Holdings paid an initial franchise fee of $50,000 to acquire the right to open an Incredible Pizza Company franchise in Sugarland.

161.    Section 5.1 of the Sugarland Franchise Agreement obligated IPC to provide the same guidance and assistance as outlined in Section 5.1 of the Houston Franchise Agreement. (Exh. M at § 5.1.)

**The Management Agreements**

162.    On April 11, 2005, FEC OKC MacArthur and Incredible Pizza Management Group, LLC (an affiliate of IPC) executed a Management Agreement for the Oklahoma City location.  (A true and correct copy of the Oklahoma City Management Agreement is attached hereto as **Exhibit N**.)

163.    FEC OKC MacArthur executed the Management Agreement because the ADA required that FEC contract management services from Incredible Pizza Management Group, LLC for a minimum of two locations.  (Exh. N at § (6)(d).)

164.    The Oklahoma City Management Agreement had a term of one year, commencing on May 1, 2005.  (Exh. N at § 1.1.)

165.    Further, the Oklahoma City Management Agreement required FEC OKC to pay a "management fee" of 5% of the location's gross sales to Incredible Pizza Management Group. (Exh. N at § 7.1.)

166.    The Oklahoma City Management Agreement allowed either party to terminate it upon 30 days notice and payment of a termination fee.  (Exh. N at § 12.1(a).)

167.    The Oklahoma City location, the first of Plaintiffs' Incredible Pizza Company franchises, opened on May 5, 2005, under the management of Incredible Pizza Company Management.

168.    On October 21, 2005, FEC Sugarland and IPC executed a Management Agreement for the Sugarland location.  (A true and correct copy of the Sugarland Management Agreement is attached hereto as **Exhibit O**.)

169.    The Sugarland Management Agreement had a term of one year, commencing on October 21, 2005, and contained the same provisions regarding management fees and termination as the Oklahoma City Management Agreement.  (Exh. O at §§ 1.1, 7.1, 12.1(a).)

170.    On October 21, 2005, FEC Pasadena and IPC executed a Management Agreement for the Pasadena location.  (A true and correct copy of the Pasadena Management Agreement is attached hereto as **Exhibit P**.)

171.    The Pasadena Management Agreement had a term of six months, commencing on March 12, 2007, and contained the same provisions regarding management fees and termination as the Oklahoma City and Sugarland Management Agreements.  (Exh. P at §§ 1.1, 7.1, 12.1(a).)

172.    On December 15, 2005, FEC Sugarland opened the Sugarland location, which was managed by Incredible Pizza Company Management.

173.    On March 7, 2006, FEC OKC MacArthur terminated the Oklahoma City Management Agreement and FEC Sugarland terminated the Sugarland Management Agreement via written notices.

174.    Plaintiffs paid cancellation fees of $241,288 and $24,878 in connection with the cancellation of the Management Agreements for Sugarland and Oklahoma City locations, respectively.

### The Euless Franchise Agreement

175.    On April 4, 2006, reasonably relying upon the representations and promises in the ADA, the Letter Agreement, the UFOCs, and the additional earnings claims made outside of the UFOCs, along with those representations made by Richard and Cheryl Barsness regarding the IPC system, FEC Euless, LP executed a Franchise Agreement for operation of an Incredible Pizza Company franchise to be located at 1201 W. Airport Freeway, Suite 400, Euless, Texas. (A true and correct copy of the Euless Franchise Agreement is attached hereto as **Exhibit Q**.)

176.    FEC Holding paid an initial franchise fee of $50,000 to acquire the right to open an Incredible Pizza Company franchise in Euless ($10,000 of which had already been paid in connection with the ADA).

177.    Section 5.1 of the Euless Franchise Agreement obligated IPC to provide the same guidance and assistance as outlined in Section 5.1 of the Houston Franchise Agreement. (Exh. Q at § 5.1.)

31

<u>**The Pasadena Franchise Agreement**</u>

178.    On April 4, 2006, reasonably relying upon the representations and promises in the ADA, the Letter Agreement, the UFOCs, and the additional earnings claims made outside of the UFOCs, along with those representations made by Richard and Cheryl Barsness regarding the IPC system, FEC Pasadena, LP executed a Franchise Agreement for operation of an Incredible Pizza Company franchise to be located at 5950 Fairmont Parkway, Pasadena, Texas.  (A true and correct copy of the Pasadena Franchise Agreement is attached hereto as **Exhibit R**.)

179.    FEC Holdings paid an initial franchise fee of $50,000 to acquire the right to open an Incredible Pizza Company franchise in Pasadena.

180.    Section 5.1 of the Pasadena Franchise Agreement obligated IPC to provide the same guidance and assistance as outlined in Section 5.1 of the Houston Franchise Agreement. (Exh. R at § 5.1.)

<u>**The Lafayette Franchise Agreement**</u>

181.    On April 4, 2006, reasonably relying upon the representations and promises in the ADA, the Letter Agreement, the UFOCs, and the additional earnings claims made outside of the UFOCs, along with those representations made by Richard and Cheryl Barsness regarding the IPC system, FEC Lafayette, LP executed a Franchise Agreement for operation of an Incredible Pizza Company franchise to be located in the Grand Marche Center in Lafayette, Louisiana.  (A true and correct copy of the Lafayette Franchise Agreement is attached hereto as **Exhibit S**.)

182.    FEC Holdings paid an initial franchise fee of $50,000 to acquire the right to open an Incredible Pizza Company franchise in Lafayette ($10,000 of which had already been paid in connection with the ADA).

183.     Section 5.1 of the Lafayette Franchise Agreement obligated IPC to provide the same guidance and assistance as outlined in Section 5.1 of the Houston Franchise Agreement. (Exh. S at § 5.1.)

## Management Agreements and Store Openings

184.     Plaintiffs took over management of the Oklahoma City and Sugarland store on April 6, 2006.

185.     The Pasadena Management Agreement expired on April 21, 2006.

186.     The Houston location opened on May 14, 2006.  This location was the first to be managed by Plaintiffs.

187.     The Pasadena location opened on March 12, 2007.

188.     The Euless location opened on April 12, 2007.

189.     The Lafayette location opened on July 11, 2007.

## The 2007 UFOC

190.     On or about September 12, 2007, IPC provided FEC with an updated copy of the IPC UFOC (the "2007 UFOC").  (A true and correct copy of the 2007 UFOC is attached hereto as **Exhibit T**.)

### *Fee Obligation Disclosure Under Item 6*

191.     In Item 6 of the 2007 UFOC, IPC outlines the fees an Incredible Pizza Company franchisee would incur, including a management fee of 3% of net sales payable to Incredible Pizza Franchise Group (Exh. T at p. 6.)

### *Purchase Obligations and Vendor Rebate Disclosures Under Item 8*

192.     In Item 8 of the 2007 UFOC, IPC states that it "will receive a commission of 10% on sales by our approved suppliers to franchisees of proprietary and private label meats, cheeses, flours, sauces, dressings, ice cream mixes and napkins." (Exh. T at pg. 13.)

193.     Further, IPC discloses in Item 8 of the 2007 UFOC that IPC will also receive "a rebate of 3% on sales by one of our vendors to franchisees for dishwashing soap, chemicals, hand soaps, detergents and other related products." (Exh. T at pg. 13.)

194.     IPC also discloses that it will receive a "marketing rebate from Coca-Cola and Dr. Pepper based on product usage and equipment rental." (Exh. T at pg. 13.)

195.     Finally, IPC discloses that, "[e]xcept for these [Coca-Cola and Dr. Pepper rebates], we do not receive any royalties, commissions or rebates from vendors which supply franchised [Incredible Pizza Company locations] . . . ." (Exh. T at pg. 13.)

196.     When it received the 2007 UFOC containing the disclosures regarding additional rebates beyond the 10% markup on proprietary items and the marketing rebate from Coca-Cola, FEC was not alarmed because the ADA expressly limited IPC's ability to accept rebates, commissions, and kickbacks in regard to purchases that Plaintiffs made from vendors.

### *Trademark Disclosures Under Item 13*

197.     IPC disclosed in Item 13 of the 2007 UFOC that it is aware of John's Incredible Pizza Company, "which claims to have operated under the name 'John's Incredible Pizza' prior to [IPC's] use of [its] Mark and this company claims to be able to prevent [IPC] from operating or franchising FECs in certain areas in which this company is operating . . . ." (Exh. T at pp. 22-23.)

198.     In Item 13, IPC also states:

[John's Incredible Pizza Company] claims that its use of its marks prior to the date of our first use constitutes sufficient grounds to prevent our registration [of the Incredible Pizza Marks], and further alleges that we obtained our trademark registration fraudulently because we knew about JIPC's use of its marks before we filed our statement of use for the trademark application.

(Exh. T at p. 22.)

199. IPC does not state in Item 13 that IPC actually knew that John's Incredible Pizza Company operated using the Incredible Pizza Company Marks prior to IPC's use of these Marks. (*See* Exh. T at pp. 22-26.)

### *Earnings Claims Disclosure Under Item 19*

200. In Item 19 of the 2007 UFOC, IPC makes specific disclosures regarding the earnings of the corporate-owned Incredible Pizza Company locations in Springfield, Missouri and Tulsa, Oklahoma. (Exh. T at p. 32.)

201. In the 2001 UFOC, IPC stated that the corporate-owned Springfield store had sales of $3,930,020 on EBITDA of $579,196 for the fiscal year ending December 31, 2006.

202. IPC also stated that the corporate-owned Tulsa store had sales of $7,451,520 and EBITDA of $1,722,265 for the same fiscal year.

203. The earnings claims implied that the performance of franchised units would be similar to that of corporate-owned units, which is not the case.

204. Rather, the performance of corporate-owned units varies dramatically from that of franchised units.

205. Further, geographic differences between the corporate location and the franchised location may affect revenues and expenses—and IPC did not disclose this material fact.

206. IPC does not disclose any other earnings claims in Item 19 of the 2007 UFOC. (*See* Exh. T at pp. 32-33.)

Case 6:10-cv-03042-RED   Document 18   Filed 01/11/10   Page 35 of 68

207.    Further, IPC does not give information on the material assumptions underlying the earnings claims that it does make in Item 19, or information on the percentage of franchised outlets in operation that actually obtained the reported results.  (*See* Exh. T at pp. 32-33.)

## The El Paso Franchise Agreement

208.    On December 19, 2007, reasonably relying upon the representations and promises in the ADA, Letter Agreement, and UFOCs, along with those representations made by Richard and Cheryl Barsness regarding the IPC system and the additional earnings claims made outside of the UFOCs, FEC El Paso, LP executed a Franchise Agreement for operation of an Incredible Pizza Company franchise to be located at 1430 North Lee Trevino Drive, El Paso, Texas.  (A true and correct copy of the El Paso Franchise Agreement is attached hereto as **Exhibit U**.)

209.    FEC Holdings paid an initial franchise fee of $50,000 to acquire the right to open an Incredible Pizza Company franchise in El Paso ($10,000 of which had already been paid under the ADA).

210.    Section 5.1 of the El Paso Franchise Agreement obligated IPC to provide the same guidance and assistance as outlined in Section 5.1 of the Houston Franchise Agreement (except for the obligations to provide guidance and assistance in regard to operating and maintaining all video and redemption games, rides and attractions and stocking and displaying redemption center merchandise and other merchandise).  (Exh. U at § 5.1.)

211.    The El Paso location opened on December 19, 2007.

## The Houston Location Closes and the Mesquite Location Opens

212.    On March 24, 2008, FEC Champions closed the Houston location due to severely declining revenues and immense and continuing operational losses.

213.     Meanwhile, FEC Holdings had secured a lease for a new Incredible Pizza Company franchise to be located at 1330 North Town East Boulevard, Mesquite, Texas (hereinafter the "Mesquite" location).  In lieu of requiring FEC Champions to execute a new Franchise Agreement for the Mesquite location, on March 31, 2008, IPC sent Mr. French an Amendment to the Houston Franchise Agreement, stating that the Mesquite location was to be governed by the Houston Franchise Agreement.

214.     The Mesquite location opened on June 26, 2008.  This location is funded and operated by Plaintiff FEC Mesquite, LP.

**Plaintiffs Discover the Misleading Nature of IPC's Representations & Omissions**

215.     In December 2006, once Plaintiffs had managed the day-to-day operations of one of their locations (previously managed pursuant to Management Agreements), Plaintiffs began to realize that their locations were not performing as represented.

216.     In 2009, due to the fact that none of Plaintiffs' franchised locations was performing consistent with Defendants' representations, Plaintiffs consulted legal counsel and discovered Defendants had breached their disclosure obligations to Plaintiffs.

217.     For example, Plaintiffs came to realize that IPC was accepting vendor rebates, commissions, and kickbacks on many items other than the 10% markup on proprietary items and the marketing rebate from Coca-Cola Company.

218.     Therefore, IPC was breaching its obligations under the ADA, and the disclosures it made in the UFOCs provided to Plaintiffs were false.

219.     Plaintiffs also discovered, after operating its locations for some time, that IPC was not going to provide the promised support to its franchisees.

220.     Specifically, the training the IPC did provide was not satisfactory.  Eventually, because of the insufficient training provided by IPC, Plaintiffs began using employees from stores that were already operating to train employees of new stores.

221.     Further, IPC marketing support has been minimal at best.   The marketing programs that it does employ change frequently, and are different at every Incredible Pizza Company store.

222.     Overall, IPC has failed to provide the promised marketing program for Incredible Pizza Company family entertainment centers, and IPC has done nothing to foster brand recognition.

223.     IPC has also failed to successfully expand and grow the Incredible Pizza Company system.   Specifically, the mandatory management agreements (and associated management fees) for all incoming franchisees make it extremely difficult for Incredible Pizza Company franchisees to operate at a profit.

224.     In fact, upon information and belief, a number of potential franchisees did not pursue the Incredible Pizza Company franchise opportunity because the management fee made it uneconomical.

225.     Therefore, the representations made by IPC with respect to the support it would provide, and particularly its representations comparing the support that IPC would provide as favorably compared to the support that Mr. Gatti's provided to its franchisees, were misleading and/or false.

226.     Further, Plaintiffs only realized after operating its locations for some time that the earnings claims made by IPC, including, but not limited to, the financial statements provided by IPC for the Springfield, Missouri and Tulsa, Oklahoma corporate-owned Incredible Pizza

Company locations, did not reflect sales levels that a franchised Incredible Pizza Company could reasonably obtain.

227.    Further, IPC has received commissions, kickbacks and rebates, despite its obligation under the ADA to only accept a 10% markup on Plaintiffs' purchases of proprietary items and the marketing rebates from the Coca-Cola Company.

228.    Upon information and belief, IPC has received and/or continues to receive commissions, kickbacks and rebates on non-proprietary items as a result of Plaintiffs' purchases from the following vendors of supplies for the franchised locations from which Plaintiffs were required to purchase supplies:

      a.      Ecolab Food Safety Solutions, the only approved supplier of dishwashing machines and all cleaning supplies;

      b.      Ecosure, a provider of food safety and work safety inspections;

      c.      Formula K, Ltd., a go-kart vendor;

      d.      Funriders, a game room attractions vendor;

      e.      Happ Controls, Inc., a game parts vendor;

      f.      Inflatable Design Group, a "bounce house" vendor;

      g.      Jake's Finer Foods (aka Jake's Inc.), a food and paper products vendor;

      h.      Kart Parts Distributors, Inc., a go-cart parts vendor;

      i.      Markham Restaurant Supply Co., a restaurant equipment & small wares vendor;

      j.      Moneysaver Publishing, a marketing company in which Mr. Barsness owns or has owned, at time material to this action, a majority interest;

      k.      Muncie Novelty Co., Inc., a redemption ticket vendor;

l.        Nancy Sales Co., Inc., a redemption prizes and toys vendor;

m.      O'Reilly Auto Parts, a go-kart batteries and supplies vendor;

n.       Osborne Coinage Co., a game room tokens vendor;

o.       Promoter Advertising Products, a vendor of uniforms, game cards, and other items containing the Incredible Pizza Company logo;

p.       Qubica AMF Worldwide, LLC, a vendor of bowling supplies;

q.       Redemption Plus, LLC, a vendor of redemption prizes and toys, through which franchisees must purchase at least 90% of their plush items;

r.       Ride Development Co., a bumper car vendor;

s.       Sara Lee Coffee & Tea, a coffee and tea vendor;

t.       Sara Lee Food Services, a vendor of spices;

u.       Shankz, a vendor of the glow golf game;

v.       Shoppers, Inc., a provider of restaurant/phone shop evaluations;

w.     Sound Advice, a provider of phone message and auto-attendant services;

x.       Sysco Food Service, a food vendor;

y.       Sureshot Redemption, a vendor of party supplies, redemption prizes, and toys;

z.       US Toy Company, a vendor of redemption prizes and toys;

aa.     Vistar Corporation, Vistar Roma Corporation, Roma of Springfield, and Vistar Roma of Houston, food vendors;

bb.     XM Satellite Radio, a supplier of satellite music; and

cc.     Zep Manufacturing Company, a vendor of game room cleaning supplies.

229. Upon information and belief, IPC has received and/or continues to receive, commissions, kickbacks and rebates as a result of FEC's purchases from the following suppliers of services and products related to the construction and build-out of the franchised locations (from which Plaintiffs were required to purchase materials and services):

     a.    Bayus-Evola Architects (also known as Bayus and Associates, Inc., Anderson-Bayus Associated Architects, and Bayus-Design Works) (architectural services);

     b.    Brady Distributing Company (a game vendor that acts as the "middleman" between franchisees and the game manufacturers; FEC is forbidden from purchasing directly from game manufacturers);

     c.    CJ Stone Construction, Inc. (general contractor);

     d.    Covenant Church Manufacturing (chairs supplier);

     e.    Daydots, an Ecolab Company;

     f.    Eddie Harrison/Fast Eddie and Multi Designs, Inc. (only approved supplier of interior décor items);

     g.    Ideal Software Systems, Inc. (vendor of POS software);

     h.    Lebanon Food Equipment Sales/Lynn Decker (small wares, chairs, etc.);

     i.    Markham Restaurant Supply (kitchen equipment and small wares);

     j.    Meredith Scott Group (carpet & tile contractor);

     k.    Springfield Sign & Neon (outside signage and décor); and

     l.    Sounds Great! SG Integration (audio/visual installer).

230. The following are specific examples of rebates, commissions, kickbacks, and other financial benefits that IPC and Richard and Cheryl Barsness have received as a result of

Plaintiffs' purchases of products and services in connection with their build-out of the Incredible Pizza Company franchised locations:

      a.    Bayus-Evola Architects, the only approved architect, told Plaintiffs that they considered themselves as employed by Richard Barsness, and they would need Richard Barsness's permission to see any drawings or modify any plans. Bayus did not allow Plaintiffs to make any changes or alterations to plans. Plaintiffs also later found out that Richard Barsness had promised Bayus that it would be guaranteed business from the first ten Incredible Pizza Company stores, without regard to whether those stores were corporate-owned or franchised.

      b.    CJ Stone, the only approved contractor, would only work on a cost plus a percentage basis. Upon information and belief, Richard Barsness was offering CJ Stone a free franchise. Further, IPC told Plaintiffs that they could not use CJ Stone, the only approved contractor, unless Plaintiffs hired IPC to provide project management services for store construction, at a cost of $100,000.

      c.    Lebanon Foods, owned by Barsness employee Lynn Decker, ordered everything from tables to ovens to plates. As part of his IPC compensation package, Decker, upon information and belief, was instructed by Barsness to invoice a percentage of the total cost of such items to the construction job. Upon information and belief, Richard Barsness received kickbacks from purchases made from Lebanon Foods.

d.      During construction, Plaintiffs also learned that several of the companies from whom they rented equipment were jointly owned by CJ Stone and Richard Barsness.

e.      Springfield Sign, which provided all of the inside and outside signage (at a cost of approximately $200,000 plus per store), was the only approved sign company.  The company was located in Springfield, Missouri, Richard and Cheryl Barsness's hometown. The costs of the signage were excessive; service was bad; and every warranty call required a travel charge to and from Springfield, Missouri.

f.      Brady Games was the only approved game vendor.  Upon information and belief, Brady Games provided and continues to provide free games to Richard and Cheryl Barsness under the guise of testing.  Defendants have refused Plaintiffs' requests to purchase directly from Brady Games' supplier.

231.    IPC's receipt of rebates, commissions and kickbacks from these vendors and suppliers as a result of Plaintiffs' purchases from these companies is a breach of the ADA.

232.    As a result of this breach, Plaintiffs have suffered substantial damages in the form of increased costs of operating their franchised locations.

233.    Furthermore, Defendants continue to engage in the wrongful conduct outlined herein to the present.

### Plaintiffs' Losses

234.    Overall, the FEC entities invested a total of $46,955,735 to construct, build-out and operate eight Incredible Pizza Company franchised locations.

43

235.     Of the seven Incredible Pizza Company franchised locations that Plaintiffs now operate (Oklahoma City, Sugarland, Pasadena, Euless, Lafayette, El Paso and Mesquite), five have posted a cumulative loss in 2009. as of the date of this filing.

236.     Plaintiffs seek to rescind the ADA, Franchise Agreements, and all related agreements, and seek to recover an award of damages sufficient to put them in the financial position place that they would have otherwise occupied had they not been fraudulently induced to execute such agreements.

### COUNT I
### Fraud/Fraudulent Inducement
#### (*All Plaintiffs Against All Defendants*)

Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

237.     Defendants' actions, as detailed above constitute fraud.

238.     Fraud occurs when a party makes a material misrepresentation with knowledge of its falsity (or recklessly without any knowledge of the truth) and as a positive assertion; the misrepresentation is made with the intention that it should be acted on by the other party; and the other party acts in reliance on the misrepresentation and thereby suffers injury.

239.     A misrepresentation is a false statement of fact, a promise of future performance made with intent not to perform as promised, or a failure to disclose when there was a duty to disclose.

240.     Defendants' actions constitute false or reckless statements of fact and failures to disclose in light of a duty to disclose.

241.     Specifically, Defendants represented that: (a) IPC would not receive any commissions or rebates as a result of franchisees' purchases from required suppliers, other than

the marketing rebate from Coca-Cola and the 10% markup on proprietary items; (b) IPC would provide substantial support, including marketing and training, to its franchisees; and (c) IPC would dramatically expand the number of Incredible Pizza Company units nationwide so as to increase visibility and brand recognition.

242.    These representations were false and made with knowledge of their falsity and/or were made recklessly without any knowledge of the truth of the representation.

243.    The above representations were made with the intent that Plaintiffs rely and act upon said representations, and Plaintiffs did in fact rely and act upon these representations in entering into the ADA and each of the seven Franchise Agreements with IPC and investing substantial sums of money and time to build out and operating their franchises.

244.    Moreover, Defendants failed to disclose certain facts to Plaintiffs when there was a duty to do so.

245.    The UFOC Guidelines require franchisors to make certain disclosures, and, as described in detail above, Defendants failed to make such required disclosures under Items 6, 8, 13 and 19 of all three UFOCs that Defendants provided to Plaintiffs.

246.    As a result of Defendants' fraudulent conduct, Plaintiffs are entitled to rescission of the ADA and Franchise Agreements between Plaintiffs and Defendants and recovery of damages suffered by Plaintiffs in an amount substantially in excess of $75,000, which amount will be proven at trial.

COUNT II
**Violations of the Texas Business Opportunity Act**
**Tex. Bus. & Com. Code § 41.001, *et seq.* (1997)[8]**
*(All Plaintiffs Against All Defendants)*

Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

247. The Texas Business Opportunity Act ("TBOA") applies to the sale of the Incredible Pizza Company franchise opportunity by IPC to FEC because many of the FEC entities are Texas residents; many of the FEC-owned Incredible Pizza Company franchises are located in the State of Texas; Plaintiff Robin French is a citizen of Texas; and IPC representative/Defendant Richard Barsness traveled to Texas to sell the Incredible Pizza Company franchise opportunity to FEC.

248. The TBOA is to "be liberally construed and applied to: (1) protect persons against false, misleading, or deceptive practices in the advertising, offering for sale or lease, and sale or lease of business opportunities; and (2) provide efficient and economical procedures to secure that protection." Tex. Bus. & Com. Code § 41.001 (1997).

249. IPC sold Plaintiffs a "business opportunity," as that term is defined in the TBOA, because Plaintiffs paid IPC an initial consideration of more than $500 for products, equipment, supplies, and/or services to begin a business, and IPC represented that: (1) Plaintiffs would earn or would be likely to earn a profit in excess of the initial consideration paid to IPC; and (2) IPC would provide a sales, production, or marketing program in connection with Plaintiffs' operation of Incredible Pizza Company franchises.

---

[8] At all relevant time periods, the 1997 version of the TBOA applied to the relationship between the parties to this dispute. Alternatively, if the 1997 version of the TBOA is inapplicable to the conduct described herein, the current version of the TBOA, Tex. Bus. & Com. Code § 51.001, *et seq.*, applies to the relationship between the parties to this dispute.

250.     While the relationship between Plaintiffs and IPC constitutes a franchise, as defined by 16 C.F.R. § 436.2(a), the sale of the Incredible Pizza Company opportunity to FEC is not excluded from the definition of "business opportunity" because IPC failed to comply with all of the requirements set forth in Tex. Bus. & Com. Code § 41.004(b)(8), including, but not limited to, IPC's failure to comply "in all material respects … with 16 C.F.R Part 436 and each order or other action of the Federal Trade Commission…."  *See* Tex. Bus. & Com. Code § 41.004(b)(8).

251.     Specifically, IPC failed to comply with the requirements of the FTC Franchise Rule, 16 C.F.R. Part 436, by providing Plaintiffs with UFOCs that:

a.     Failed to disclose under Item 6 that the management fees that FEC would be required to pay were mandatory;

b.     Failed to completely disclose the extent of vendor rebates, kickbacks and commissions that IPC would receive as a result of Plaintiffs' purchases under Item 8;

c.     Failed to disclose, under Item 13, the fact that IPC and/or Richard and Cheryl Barsness had actual knowledge of John's Incredible Pizza Company's prior use of the IPC Marks; and

d.     Failed to disclose all earnings claims that it made to FEC under Item 19, and, for those earnings claims that it did disclose, failed to disclose all material assumptions on which those claims were based, the factual bases for the earnings claims, and other relevant information required by the Item 19 UFOC Guidelines.

252.    Therefore, because IPC failed to comply with the disclosure requirements of the FTC Rule, IPC is not excluded from the definition of "business opportunity" under the TBOA.

253.    It is a violation of the TBOA for any person selling a business opportunity to:

a.    employ a representation, device, scheme, and/or artifice to deceive a purchaser;

b.    make untrue statements of a material fact or omit to state a material fact in connection with the documents and information required to be furnished to the Secretary of State[9] or the purchaser;

c.    represent that the business opportunity provides or will provide income or earning potential unless the seller:  (a) has documented data to substantiate the claims of income or earning potential; and (b) discloses the data to the purchaser when the representation is made; or

d.    makes a claim or representation in advertising or promotional material or in an oral sales presentation, solicitation, or discussion between the seller and purchaser that is inconsistent with the information required to be disclosed by the TBOA.

254.    Defendants' conduct, in selling the Incredible Pizza Company franchise opportunity to Plaintiffs, violated each of the above provisions.

255.    Defendants violated the TBOA by doing the following actions, including, but not limited to, making the false representations and material omissions in the UFOCs provided to Plaintiffs, as outlined in detail *supra*.

256.    Specifically, the UFOCs that IPC provided to FEC failed to disclose that:

---

[9] The TBOA requires that sellers of franchise opportunities file a disclosure statement with the Secretary of State.  IPC would have satisfied this requirement as long as it filed its UFOC with the Texas Secretary of State.

a.      Management fees would be mandatory;

b.      IPC would accept vendor rebates, commissions and kickbacks as a result of franchisee purchases that would substantially exceed the rebates disclosed in Item 8;

c.      IPC and Richard and./or Cheryl Barsness actually knew that John's Incredible Pizza Company used the Incredible Pizza Company Marks prior to IPC; and

d.      The earnings claims provided to Plaintiffs, based on the corporate-owned Incredible Pizza locations in Springfield and Tulsa, failed to account for the fact that these stores did not pay franchise or management fees.

257.    Defendants' violations of the TBOA constitute false, misleading, and/or deceptive acts and practices under the Texas Deceptive Trade Practices—Consumer Protection Act, which grants Plaintiffs a private right of action and authorizes Plaintiffs to utilize the remedies prescribed therein.  Tex. Bus. & Com. Code § 41.302 (1997).

258.    Accordingly, Plaintiffs are entitled to recover the damages they have suffered as a result of Defendants' violations of the TBOA, including treble economic damages, attorneys' fees, and treble damages for mental anguish.  *See* Tex. Bus. & Com. Code § 17.50(b).

259.    Furthermore, Plaintiffs may recover these damages from Incredible Pizza Company and Richard and Cheryl Barsness, in their individual capacities.  *See Kingston v. Helm*, 82 S.W.3d 755, 759 (Tex. App. 2002) (holding that a corporate officer may be held individually liable for TDTPA violations "even though the representations were made in the course of a business transaction conducted in the course and scope of their employment with the corporation") (citing *Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex. 1985)).

260.    As a direct and proximate result of Defendants' violations of the TBOA, Plaintiffs have suffered, and are entitled to recover, damages in an amount substantially in excess of $75,000, prior to applicable trebling, which amount will be proven at trial, plus its costs and reasonable attorneys' fees.

261.    Furthermore, as a direct and proximate result of Defendants' violations of the TBOA, FEC is entitled to rescission of the Franchise Agreements.

## COUNT III
## Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing
### *(All Plaintiffs Against IPC)*

Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

262.    Every contract, by operation of law, including each of the Agreements between Plaintiffs and IPC, contains an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act in good faith and in accordance with reasonable standards of fair dealing in the trade.

263.    The implied covenant also prohibits either party from engaging in any conduct or in doing anything that deprives the other party of the fruits of the agreement or the benefit of the bargain.

264.    The implied covenant requires IPC to act reasonably under the terms of the Agreements, and, among other things, to refrain from conduct that would cause Plaintiffs substantial damage.

265.    Pursuant to the Franchise Agreements, IPC had certain contractual obligations, including, but not limited to the following:

a.       to provide the assistance and guidance as outlined in Section 5.1 of each Franchise Agreement; and

b.       to refuse to accept vendor rebates, commissions, and kickbacks as a result of FEC's purchases of supplies, products and services from required suppliers, as outlined in the ADA.

266.    As described in detail above, IPC did not provide the guidance and assistance that it promised in the Franchise Agreements.

267.    Further, in violation of its express contractual obligation to not accept vendor rebates, commissions, or kickbacks as a result of Plaintiffs' purchases (other than the 10% markup on proprietary products and the marketing rebate from Coca-Cola), IPC did, upon information and belief, accept numerous other rebates, commissions, and kickbacks as a result of Plaintiffs' purchases related to the operation of its Incredible Pizza Company franchises.

268.    Pursuant to the implied covenant of good faith and fair dealing in every contract, it is not enough that IPC may have simply provided some of the promised guidance and support; rather, when it has the contractual obligation to provide guidance and support, it must do so *adequately*.

269.    IPC breached its contractual obligations and the duty of good faith and fair dealing when it failed to adequately provide the promised guidance and assistance to Plaintiffs in regard to the operation of Plaintiffs' Incredible Pizza Company franchised locations.

270.    As a direct and proximate result of IPC's material breaches of its contractual duties and the implied duty of good faith and fair dealing, Plaintiffs have suffered damages substantially in excess of $75,000, and are entitled to recover their damages from IPC.

271.    The above described breaches are material and go to the very substance or root of the Agreements.  Plaintiffs are, accordingly, entitled to rescission of the Franchise Agreements due to IPC's material breaches.

### COUNT IV
### Violations of the Texas Deceptive Trade Practices—Consumer Protection Act
### Tex. Bus. & Com. Code § 17.41, *et seq.*
### *(All Plaintiffs Against All Defendants)*

Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

272.    The Texas Deceptive Trade Practices—Consumer Protection Act ("TDTPA") is to "be liberally construed and applied to promote its underlying purposes, which are to protect against false, misleading, and deceptive business practices, unconscionable actions … and to provide efficient and economical procedures to secure such protection."  Tex. Bus. & Com. Code § 17.44.

273.    Plaintiffs qualify as "consumers" under the TDTPA because Plaintiffs are individuals and corporations that sought to and did acquire goods and/or services by purchase or lease.   Tex. Bus. & Com. Code § 17.45(4); *see also Texas Cookie Co. v. Hendricks & Peralta, Inc.*, 747 S.W.2d 873 (Tex. Ct. App. 1988) (holding that the purchase of a franchise falls within the definition of "goods and services" under the TDTPA).

274.    It is a violation of the TDTPA for any person to:

    a.    represent that goods or services have characteristics … or benefits that they do not have; or

    b.    represent that an agreement confers rights that it does not, in fact, confer.

*See* Tex. Bus. & Com. Code §§ 17.46(b)(5), (b)(12).

275.     Additionally, it is a violation of the TDTPA to: (1) employ a false, misleading, or deceptive act or practice, upon which the consumer relies to their detriment; or (2) perform unconscionable actions or engage in unconscionable courses of action. Tex. Bus. & Com. Code § 17.50(a).

276.     Defendants' conduct, as more fully described above, which Plaintiffs relied upon to their detriment, violated each of these provisions of the TDTPA.

277.     Specifically, Defendants violated the TDTPA by taking the following actions, which include, but are not limited to:

a.       Representing that IPC would not accept vendor rebates, commissions, and kickbacks as a result of franchisee purchases, except for the 10% markup on proprietary items and the marketing rebate from the Coca-Cola Company, when, in fact, IPC did intend to receive and was receiving rebates, commissions, and kickbacks from other vendors of other products and services as a result of Plaintiffs' purchases from required suppliers and vendors;

b.       Representing the Incredible Pizza Company franchises could expect over 15,000 customers a week, with an average ticket price of $10 to $12 per customer, for revenues exceeding $7.8 million annually;

c.       Failing to make the required disclosures in the UFOC, as described in detail above;

d.       Acting in violation of the Texas Business Opportunity Act; and

e.       Fraudulently inducing Plaintiffs to enter into the above-described ADA and Franchise Agreements.

278. Defendants knowingly and intentionally violated the TDTPA.

279. The TDTPA entitles Plaintiffs to recover treble economic damages caused by Defendants' knowing and intentional violations of the TDTPA. Tex. Bus. & Com. Code § 17.50(b).

280. The TDTPA also entitles Plaintiffs to recover treble damages for mental anguish, due to Defendants' knowing and intentional violations of the TDTPA. Tex. Bus. & Com. Code § 17.50(b).

281. Additionally, Plaintiffs are entitled to recover their attorneys' fees and costs. Tex. Bus. & Com. Code § 17.50(b).

282. Plaintiffs may recover these damages from Incredible Pizza and Richard and Cheryl Barsness, in their individual capacities. *See Kingston v. Helm*, 82 S.W.3d 755, 759 (Tex. App. 2002) (holding that corporate officer may be held individually liable for TDTPA violations "even though the representations were made in the course of a business transaction conducted in the course and scope of their employment with the corporation") (citing *Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex. 1985)).

283. As a direct and proximate result of Defendants' violations of the TDTPA, Plaintiffs have suffered, and are entitled recover, damages in an amount substantially in excess of $75,000, which amount will be proven at trial, plus their costs and reasonable attorneys' fees.

284. Furthermore, as a direct and proximate result of Defendants' violations of the TDTPA, Plaintiffs are entitled to rescind the Franchise Agreements.

## COUNT V
### Violations of Oklahoma Deceptive Trade Practices Act
### Okla. Stat. tit. 78 § 51, *et seq.*
#### *(All Plaintiffs Against All Defendants)*

Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

285.    The Oklahoma Deceptive Trade Practices Act ("ODTPA") provides that a person engages in a deceptive trade practice when that person, in the course of his business, vocation, or occupation, knowingly makes a false representation as to the characteristics or benefits of goods or services.  Okla. Stat. tit. 78 § 53(A)(5).

286.    Defendants, in the course of their business (*i.e.,* selling the Incredible Pizza Company franchise opportunity to Plaintiffs), knowingly made false representations regarding the characteristics and/or benefits of the goods and/or services being sold to Plaintiffs.

287.    Specifically, Defendants violated the ODTPA by:

    a.    Representing that IPC would not accept vendor rebates, commissions, and kickbacks as a result of franchisee purchases, except for the 10% markup on proprietary items and the marketing rebate from the Coca-Cola Company, when, in fact, IPC did intend to receive and was receiving rebates, commissions, and kickbacks from other vendors of other products and services as a result of Plaintiffs' purchases;

    b.    Representing the Incredible Pizza Company franchises could expect over 15,000 customers a week, with an average ticket price of $10 to $12 per customer, for revenues exceeding $7.8 million annually; and

    c.    Failing to make the required disclosures in the UFOC, as described in detail above.

288.    The ODTPA provides that any person damaged by a deceptive trade practice is entitled to recover the actual damages sustained, plus reasonable attorneys' fees.

289.    Accordingly, as a direct and proximate result of Defendants' violations of the ODTPA, Plaintiffs have suffered, and are entitled recover, damages in an amount substantially in excess of $75,000, which amount will be proven at trial, plus their costs and reasonable attorneys' fees.

290.    Furthermore, as a direct and proximate result of Defendants' violations of the ODTPA, Plaintiffs are entitled to rescind the Franchise Agreements.

## COUNT VI
### Violations of Oklahoma Consumer Protection Act
### Okla. Stat. tit. 15 § 751, *et seq.*
*(All Plaintiffs Against All Defendants)*

Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

291.    Plaintiffs and Defendants were engaged in a "consumer transaction," as that term is defined by the Oklahoma Consumer Protection Act ("OCPA"), because Defendants sold and offered for sale to Plaintiffs services and/or property, tangible or intangible, which were business oriented.  Okla. Stat. tit. 15 § 752(2).

292.    Pursuant to the OCPA, a person engages in a practice which is declared to be unlawful under the OCPA when, in the course of the person's business, the person:

        a.    Makes a false representation, knowingly or with reason to know, as to the characteristics or benefits of the subject of a consumer transaction;

        b.    Makes a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person, before, during, or after a consumer transaction; or

Case 6:10-cv-03042-RED   Document 18   Filed 01/11/10   Page 56 of 68

> c.      Engages in any practice which offends established public policy, or if the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

Okla. Stat. tit. 15 § 753 (5) and (20).

293.     Defendants, in the course of their business, committed each of these prohibited acts, each of which violated the OCPA.

294.     Specifically, Defendants, in the course of their business, violated the OCPA by performing the following actions, including, but not limited to:

> a.      Representing that IPC would not accept vendor rebates, commissions, and kickbacks as a result of franchisee purchases, except for the 10% markup on proprietary items and the marketing rebate from the Coca-Cola Company, when, in fact, IPC did intend to receive and was receiving rebates, commissions, and kickbacks from other vendors of other products and services as a result of Plaintiffs' purchases;
>
> b.      Representing the Incredible Pizza Company franchises could expect over 15,000 customers a week, with an average ticket price of $10 to $12 per customer, for revenues exceeding $7.8 million annually; and
>
> c.      Failing to make the required disclosures in the UFOC, as described in detail above.

295.     Pursuant to the OCPA, a plaintiff may recover the actual damages it has sustained as a result of the violations of the OCPA, plus its costs and reasonable attorneys' fees.

296.     Accordingly, as a direct and proximate result of Defendants' violations of the OCPA, Plaintiffs have suffered, and are entitled recover, damages in an amount substantially in

excess of $75,000, which amount will be demonstrated at trial, plus their costs and reasonable attorneys' fees.

297.    Furthermore, as a direct and proximate result of Defendants' violations of the OCPA, Plaintiffs are entitled to rescind the Franchise Agreements.

**COUNT VII**
**Negligent Misrepresentation**
*(All Plaintiffs Against All Defendants)*

Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

298.    Defendants owed Plaintiffs a duty to use reasonable care in making representations upon which it knew Plaintiffs would rely.

299.    Defendants owed Plaintiffs a duty of care because they were supplying information for the guidance of Plaintiffs in a transaction in which they had a pecuniary interest and in the course of their business.

300.    Defendants breached their duty to exercise reasonable care by negligently making false and misleading representations of material fact (and/or omitting material facts), as described *supra* and incorporated herein, upon which Plaintiffs reasonably relied upon.

301.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered, and are entitled recover, damages in an amount substantially in excess of $75,000, which amount will be proven at trial.

302.    Furthermore, as a direct and proximate result of Defendants' conduct, Plaintiffs are entitled to rescind the Franchise Agreements.

**COUNT VIII**
**Violations of Section 2(c) of the Robinson Patman Act**
**15 U.S.C. § 12,** *et seq.*
*(All Plaintiffs Against IPC)*

Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

303.     Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 12, *et seq.*, provides, in relevant part, as follows:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein....

15 U.S.C. § 13(c).

304.     IPC engages (or has engaged) in commerce by, among other things, establishing national and regional contracts for the provision of goods, wares, and/or merchandise to Incredible Pizza Company franchisees throughout the United States.

305.     IPC has entered into exclusive and/or preferred contracts with particular vendors to provide goods, wares, and/or merchandise to franchisees. In connection with these contracts, IPC has solicited and accepted payments by third-party vendors in exchange for the opportunity to access and market goods, wares and merchandise to the franchisees and to execute agreements to sell the same to franchisees.

306.     These payments are, in fact, kickbacks which have not been paid for services rendered in connection with the sale or purchase of goods, wares, and/or merchandise by IPC or its franchisees.

307.     Plaintiffs have been injured and may continue to be injured by these acts because Plaintiffs are restricted in their choice of and access to independent vendors and consequently have paid prices for goods, wares, and/or merchandise and other products that were higher than they would have paid in the absence of IPC's kickback scheme.

308.     IPC's kickback scheme is *per se* unlawful and constitutes *per se* competitive injury.

309.     By reason of the foregoing, IPC has violated Section 2(c) of the Robinson Patman Act, and Plaintiffs are entitled to treble damages, the costs of this litigation, attorneys' fees and prejudgment interest, pursuant to 15 U.S.C. § 15(a).

## COUNT IX
## Violation of RICO: 18 U.S.C. § 1962(b)
### *(All Plaintiffs Against All Defendants)*

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

310.     Defendants have violated the civil provisions of the RICO statute as described more fully below.

311.     Under 18 U.S.C. § 1964(c):

> any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

312.     Under 18 U.S.C. § 1961(3), a "person" for the purposes of civil RICO statute is defined as "any individual or entity capable of holding a legal or beneficial interest in a property."

313.     The RICO statute defines the term "enterprise" to include "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

314.     IPC is a "person" within the meaning of the RICO statute, as set forth above.  The association of IPC and Richard and Cheryl Barsness, along with the association of Defendants with Incredible Pizza Management Group, LLC, and each of the individual vendors and suppliers listed in Paragraphs 228 and 229 herein, constituted an "enterprise" as the term is defined in the RICO statute.

315.     Under 18 U.S.C. § 1962(b):

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

316.     Section 1961(1) of RICO defines "racketeering activity" to include any of the enumerated predicate acts listed in § 1961(1).  Included in the list of predicate acts are "mail fraud" and "wire fraud."

317.     Under 18 U.S.C. § 1341, mail fraud is defined as:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly caused to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing . . . .

> Under 18 U.S.C. § 1343, wire fraud is defined as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such a scheme or artifice . . . .

318.     At all times relevant to the claims made herein, IPC and Richard and Cheryl Barsness have acquired and maintained an interest in, and control of, the enterprise consisting of IPC and Richard and Cheryl Barsness, Incredible Pizza Management Group, LLC, and each of the individual suppliers and vendors listed in Paragraphs 228 and 229 herein, and their collusion together, by engaging in the false, fraudulent and illegal acts set forth above, which took place in interstate commerce, constituted acts of wire fraud and mail fraud – *i.e.,* sending misleading and false UFOCs and other documents through the mails and making false and fraudulent statements via the telephone and otherwise.

319.     The activities of the enterprise of IPC, Richard and Cheryl Barsness, Incredible Pizza Management Group, LLC and each of the individual vendors and suppliers listed in Paragraphs 228 and 229 herein constituted a pattern of racketeering activity in that the activities were both continuous and related: the false acts were all intended to induce scores of persons to become franchisees of IPC under false pretenses (e.g., by suggesting that franchisees' required purchases of goods and services did not inure to the financial benefit of Defendants). Defendants induced many persons to become franchisees under franchise agreements pursuant to which they would continue to pay franchise fees, management fees and other fees to IPC for many years, and the scheme threatens to continue. System franchisees have been forced to pay above-market-rate prices for goods and services sourced from third-party suppliers and vendors (i.e., in order to finance such suppliers' and vendors' secret rebates to Defendants).

320.   Defendants had an affirmative obligation, pursuant to the FTC Franchise Rule, to disclose their intention to accept any rebates, commissions or kickbacks as a result of franchisee's required purchases, and Defendants failed to fulfill this affirmative obligation.

321.   Further, Defendants intended, through the racketeering activity described herein, to fraudulently induce Plaintiffs to become part of a franchise system in which Plaintiffs would (and did) purchase supplies, equipment and construction and build-out services offered by the vendors and suppliers listed in Paragraphs 228 and 229 herein, at inflated prices so that Defendants could receive and continue to receive rebates, commissions and kickbacks as a result of Plaintiffs' purchases from these vendors and suppliers.

322.   Plaintiffs have been injured in their businesses and property as a result of Defendants' violations of 18 U.S.C. § 1962(b).  Specifically, Plaintiffs have been deprived of the amounts that they paid to IPC pursuant to the franchise agreements and management agreements and for additional amounts.  Plaintiffs have also been injured as a result of their having paid above-market-rate prices for goods and services sourced from IPC's designated suppliers and vendors.  Plaintiff's damages were incurred, in substantial part, in the Southern District of Texas.

323.   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(b), Plaintiffs have suffered damages in an amount undetermined at this time, but believed to be substantially in excess of $75,000, which will be demonstrated at trial.

**COUNT X**
**Violation of RICO: 18 U.S.C. § 1962(c)**
***(All Plaintiffs Against All Defendants)***

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

324.   Under 18 U.S.C. § 1962(c):

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

325. At all times relevant hereto, IPC has either conducted or participated in an ongoing and continuous enterprise designed to induce scores of persons to become franchisees of IPC and to pay above-market-rates for goods and services that the Plaintiff franchisees were obligated to purchase by the terms of their franchise agreements, which continuous effort constitutes a pattern of racketeering activity.

326. The enterprises engaged in interstate commerce to accomplish its scheme of defrauding and deceiving Plaintiffs, and its actions affected interstate commerce in that the amounts that IPC received were based on the sale and purchase of items that crossed state lines.

327. Defendants' receipt of funds from designated franchise system suppliers and vendors (from whom Plaintiffs have purchased system-standard goods and services) has harmed Plaintiffs' businesses as the premiums for goods and services paid by Plaintiffs have been secretly rebated to IPC.

328. Further, Defendants had an affirmative obligation, pursuant to the FTC Franchise Rule, to disclose their intention to accept any rebates, commissions or kickbacks as a result of franchisee's required purchases, and Defendants failed to fulfill this affirmative obligation.

329. Therefore, as a result of Defendants' RICO violations, and, particularly, Defendants' use of the funds procured through the actions taken in violation of RICO, Plaintiffs have suffered injury.

330. Plaintiffs have been injured in their business and property as a result of Defendants' violations of 18 U.S.C. § 1962(c). Plaintiffs have been deprived of the amounts that

they paid to IPC pursuant to the franchise agreements, and for additional amounts. Plaintiffs have also been injured as a result of their having paid above-market-rate prices for goods and services sourced from IPC's designated suppliers and vendors. Plaintiff's damages were incurred, in substantial part, in the Southern District of Texas.

331.    As a direct and proximate result of IPC's violations of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages in an amount undetermined at this time, but believed to be substantially in excess of $75,000, which will be demonstrated at trial.

**COUNT XI**
**Violation of RICO: 18 U.S.C. § 1962(d)**
*(All Plaintiffs Against All Defendants)*

Plaintiffs reallege and incorporate by reference all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

332.    Under 18 U.S.C. § 1962(d), it is unlawful:

> For any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

333.    At all times relevant hereto, IPC and Richard and Cheryl Barsness conspired in violation of Sections 1962(b) and (c), as alleged above.

334.    This conspiracy took place from the Plaintiffs' first contact with IPC representatives in regard to the Incredible Pizza Company franchise opportunity in early 2003 through the present.

335.    Upon information and belief, the object of the conspiracy between Defendants and IPC's individual suppliers and vendors was to induce Plaintiffs to enter into the ADA and the Franchise Agreements (requiring that Plaintiffs purchase goods and services from suppliers and vendors designated by IPC) and, while performing under these agreements, pay substantial

sums to IPC's affiliates, including, but not limited to, Incredible Pizza Company Management Company Group, LLC, and the suppliers and vendors listed in Paragraphs 228 and 229 herein.

336.    Defendants, in turn, conspired with the designated suppliers and vendors to establish a program pursuant to which Defendants received material consideration from the designated suppliers and vendors based on purchases made by Plaintiffs from such vendors and suppliers.

337.    Defendants took the fraudulent actions outlined in detail herein in furtherance of this conspiracy and in order to achieve these purposes of the conspiracy.

338.    Further, Defendants had an affirmative obligation, pursuant to the FTC Franchise Rule, to disclose their intention to accept any rebates, commissions or kickbacks as a result of franchisee's required purchases, and Defendants failed to fulfill this affirmative obligation.

339.    Plaintiffs have been injured in their business and property as a result of Defendants' violations of 18 U.S.C. § 1962(d).  Plaintiffs have been deprived of the amounts that they paid to IPC pursuant to the franchise agreements, and for additional amounts.  Plaintiffs have also been injured as a result of their having paid above-market-rate prices for goods and services sourced from IPC's designated suppliers and vendors.  Plaintiff's damages were incurred, in substantial part, in the Southern District of Texas.

340.    As a direct and proximate result of IPC's violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damages in an amount undetermined at this time, but believed to be substantially in excess of $75,000, which will be demonstrated at trial.

# PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully requests the following relief:

1.      An award in favor of Plaintiffs for their full amount of damages;

2.      An award granting Plaintiffs rescission of their Agreements with Defendants;

3.      An award granting Plaintiffs trebled damages to the extent authorized by law;

4.      An award granting Plaintiffs their costs, disbursements and reasonable attorneys' fees incurred herein to the extent authorized by law; and

5.      An award granting Plaintiffs such other and further relief as the Court may deem just and appropriate.

DATED: _____, 2010.          Respectfully submitted,


_____
          *s/ J. Michael Dady*
**J. Michael Dady** (MN#2062X)
5100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612)359-9000
Facsimile:   (612)359-3507

**Attorney-in-Charge for FEC Plaintiffs**


_____
          *s/ Lloyd R. Cunningham*
**Lloyd R. Cunningham**, 05247500/4609
12 Greenway Plaza, Suite 1310
Houston, Texas 77046
Telephone: (713)961-9929
Facsimile: (713)961-9788

**Attorney-in-Charge for Plaintiff Lloyd Robert French, III**

OF COUNSEL:

**DADY & GARNER, P.A.**
John D. Holland (MN#028614X)
Mary K. DesCombaz (MN#0398355)
5100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612)359-9000
Facsimile:   (612)359-3507

**CUNNINGHAM LAW GROUP**
Joe H. Reynolds
Lori A. Swann
12 Greenway Plaza, Suite 1310
Houston, Texas 77046
Telephone: (713)961-9929
Facsimile: (713)961-9788

Case 6:10-cv-03042-RED   Document 18   Filed 01/11/10   Page 68 of 68